1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9   STEVEN LYNN BROOKS,

10                                     Plaintiff,                    Case No. C11-2104-JCC-JPD

11          v.

12   STEVEN HAMMOND, *et al.*,                          REPORT AND RECOMMENDATION

13                                     Defendants.

14

15                    INTRODUCTION AND SUMMARY CONCLUSION

16          Plaintiff Steven Brooks is a state prisoner who is currently incarcerated at the Monroe

17   Correctional Complex (MCC).  He has filed a civil rights action under 42 U.S.C. § 1983 alleging

18   that the named defendants denied him adequate medical care for a serious medical condition in

19   violation of his rights under the Eighth Amendment.  Plaintiff identifies the following individuals

20   as defendants in this action:  Steven Hammond, M.D., Chief Medical Officer for the Washington

21   Department of Corrections (DOC); Kenneth Lauren, M.D., Facility Medical Director at the

22   MCC; and, Roberta Kanive, Certified Advanced Registered Nurse Practitioner (ARNP) at the

23   MCC.

REPORT AND RECOMMENDATION - 1

Defendants have filed a motion for summary judgment seeking dismissal of the claims asserted by plaintiff in his amended complaint.  Plaintiff has not filed a response to defendants' motion but has, instead, moved for voluntary dismissal of this action.  Defendants oppose plaintiff's motion for voluntary dismissal.  The Court, having reviewed the parties' pending motions, and the balance of the record, concludes that plaintiff's motion for voluntary dismissal should be denied, defendants' motion for summary judgment should be granted, and plaintiff's amended complaint and this action should be dismissed with prejudice.

BACKGROUND

This action arises out of the treatment plaintiff received at the MCC for a medical condition involving his right hip, leg and foot.  (*See* Dkt. No. 31 at 1-2.)  Plaintiff complains that despite having knowledge of his serious medical condition as early as October 2006, defendants failed to provide proper medical care to relieve the chronic pain in his hip until December 2011 when hip replacement surgery was performed.  (*Id.* at 2.)  Defendant Kenneth Lauren, M.D., M.P.H., has submitted a declaration which details the medical care provided to plaintiff during the time period in question.  (*See* Dkt. No. 39, Ex. 1.)  The relevant facts concerning plaintiff's medical care are set forth below.[1]

On October 20, 2006, plaintiff was seen by Vickie Martin, a Certified Physician's Assistant (PA), for complaints of insomnia and irritability.  (*Id.*, Ex. 1 at 3.)  Plaintiff also complained at this appointment of right hip pain and increased lower back pain.  (*Id.*)  Because the reported hip and low back pain were new complaints, PA Martin ordered x-rays of plaintiff's lower spine and right hip.  (*Id.*, Ex. 1 at 3.)  MCC medical staff took x-rays on October 25, 2006

---

[1]  Plaintiff has offered no evidence or argument to rebut the facts set forth in Dr. Lauren's declaration and, thus, this Court relies on those facts to provide the relevant background.

REPORT AND RECOMMENDATION - 2

1   which revealed "mild spurring about the femoral head with mild narrowing of the hip joint space

2   in the weight-bearing region."  (Dkt. No. 39, Ex. 1 at 4.)

3     Plaintiff was seen again by PA Martin on November 13, 2006 for complaints of a

4   "pinching sensation" in his abdomen.  (*Id*.)  Plaintiff indicated that the pinching sensation did not

5   result in extreme pain.  (*Id*.)  PA Martin noted at this appointment that plaintiff had mild to

6   moderate degenerative joint disease and she stressed to plaintiff the importance of taking

7   Ibuprofen for pain relief.  (*Id*.)  PA Martin also referred plaintiff to an orthopedic surgeon for his

8   hip pain.  (*Id*.)  At a follow-up appointment on December 21, 2006, plaintiff reported to PA

9   Martin that he was "feeling well" and experiencing decreased pain.  (*Id*.)  He also indicated he

10   was exercising daily.  (*Id*.)  PA Martin instructed plaintiff to return to the clinic as necessary and

11   advised that he should follow-up with her every two months.  (*Id*.)

12     On February 26, 2007, plaintiff was seen by Dr. James Swenson of the Evergreen

13   Orthopedic Clinic for evaluation of his back, leg, and hip pain.  (*Id*.)  Dr. Swenson reported that

14   plaintiff walked without a limp, that his hip had full range of motion, and that his back had mild

15   tenderness.  (*Id*.)  Dr. Swenson also noted that x-rays revealed mild degenerative joint disease in

16   plaintiff's hip and some degenerative disc disease of the lumbar spine.  (*Id*.)  Dr. Swenson

17   recommended a screening MRI of plaintiff's lumbar spine based on his concern that the source

18   of plaintiff's pain was not his hip.  (*Id*.)

19     On April 11, 2007, the DOC's Care Review Committee (CRC) convened to review

20   plaintiff's case and the medical necessity for further orthopedic evaluation, testing, and surgery.

21   (*Id*.)  PA James Jellison presented plaintiff's case to the CRC, including Dr. Swenson's

22   recommendation for a screening MRI of plaintiff's lumbar spine.  (*Id*., Ex. 1 at 4-5.)  The CRC

23   deemed the recommended MRI not medically necessary because a course of conservative care

REPORT AND RECOMMENDATION - 3

1   had not been exhausted.  (Dkt. No. 39, Ex. 1 at 5.)  The CRC suggested further conservative

2   treatment before proceeding with surgical intervention and recommended a tapering course of

3   corticosteroids to help relieve pain and inflammation.  (*Id*.)  PA Jellison thereafter prescribed

4   Prednisone for plaintiff and noted that if there was no change in symptoms then plaintiff's case

5   would be resubmitted to the CRC.  (*Id*.)

6          Plaintiff was seen again by PA Jellison in late May 2007.  (*Id*.)  Plaintiff reported that his

7   back had improved with the Prednisone and that he did not need pain medication at that time.

8   (*Id*.)  Plaintiff had a follow-up appointment with PA Jellison in late June or early July 2007 at

9   which time plaintiff reported again that his back was doing much better.  (*Id*.)  PA Jellison noted

10  that he would refer plaintiff to physical therapy.  (*Id*.)

11         Plaintiff was seen by Physical Therapist (PT) William Moynihan on August 2, 2007 for

12  an initial evaluation.  (*Id*.)  Plaintiff reported to PT Moynihan that he suffered chronic back

13  problems and also that shoe orthotics, exercises, and oral steroids had helped a lot with his pain.

14  (*Id*.)  PT Moynihan recommended some stretching exercises for plaintiff's hip and lower back.

15  (*Id*.)

16         Members of the MCC medical staff continued to treat plaintiff's pain between late 2007

17  and late 2009 using conservative treatments such as custom designed shoe inserts and topical

18  pain relief cream, with varying degrees of success.   (*Id*.)

19         On October 28, 2009, plaintiff was seen by ARNP Roberta Kanive.  (*Id*.)  Plaintiff

20  reported at that time that he was experiencing increased pain in his right hip but that he was not

21  using any pain support.  (Dkt. No. 39, Ex. 1 at 5-6.)  ARNP Kanive prescribed Oxycodone to

22  treat plaintiff's pain and she ordered another x-ray of plaintiff's right hip.  (*Id*., Ex. 1 at 6.)  The

23  x-ray, taken a few days later on November 4, 2009, showed "moderate narrowing of the

REPORT AND RECOMMENDATION - 4

1    superolateral joint" indicating "mild to moderate changes."  (Dkt. No. 39, Ex. 1 at 6.)  After

2    reviewing this x-ray, ARNP Kanive prescribed an anti-inflammatory, Etodolac, for management

3    of plaintiff's pain and inflammation.  (*Id.*)

4         Plaintiff was seen again by ARNP Kanive on April 13, 2010 at which time plaintiff

5    continued to complain of hip pain and reported that his shoe inserts were not helping with the

6    pain.  (*Id.*)  Plaintiff also reported that he had been using Ibuprofen to relieve pain.  (*Id.*)  ARNP

7    Kanive recommended that plaintiff use a cane to help relieve his pain and plaintiff agreed.  (*Id.*)

8         On May 28, 2010, plaintiff met with ARNP Kanive to address management of his hip

9    pain.  (*Id.*)  Plaintiff indicated during that appointment that the Ibuprofen seemed to help more

10   than the previously prescribed Etodolac so ARNP Kanive prescribed 800mg Ibuprofen for

11   plaintiff for a period of four months.  (*Id.*)  At a follow-up appointment on August 20, 2010,

12   plaintiff reported to ARNP Kanive that his right hip pain was significant.  (*Id.*)  ARNP Kanive

13   prescribed Oxycodone to manage the pain and requested that plaintiff follow-up in two months.

14   (*Id.*)  Plaintiff followed-up again with ARNP Kanive on October 27, 2010, at which time

15   plaintiff reported that the pain medicine had helped his right hip but did not alleviate the pain

16   completely.   (*Id.*)  ARNP Kanive made no further recommendations at that time given plaintiff's

17   report that the pain had improved.  (*Id.*)

18         On June 6, 2011, plaintiff was seen by the MCC medical staff for increased pain in his

19   right hip.  (*Id.*)  Plaintiff reported that the pain had increased over the last six months and the

20   medical assistant scheduled an appointment for plaintiff with ARNP Kanive on June 14, 2011.

21   (*Id.*)  At that appointment, plaintiff reported that his pain was constant and he expressed concern

22   that continued pain medication would damage his liver.  (*Id.*, Ex. 1 at 7.)  ARNP Kanive ordered

23   a repeat x-ray of plaintiff's right hip to check for advancement of his degenerative disease.  (*Id.*)

REPORT AND RECOMMENDATION - 5

1   This x-ray, taken on June 22, 2011, showed a narrowing of the upper joint space and moderate

2   degenerative spurring.  (Dkt. No. 39, Ex. 1 at 7.)  These results were consistent with moderate

3   osteoarthritis and  possible avascular necrosis (AVN), or loss of bone on the joint surface.  (*See*

4   *id.*, Ex. 1 at 3 and 7.)

5          Plaintiff returned for a follow-up appointment with ARNP Kanive on July 5, 2011.  (*Id.*,

6   Ex. 1 at 7.)  ARNP Kanive noted at that time that plaintiff was agreeable to pain management.

7   (*Id.*)  She also noted that plaintiff continued to use a cane and was working pushing a motorized

8   supply cart.  (*Id.*)  ARNP Kanive ordered a routine EKG in anticipation of possible hip surgery

9   to screen for any cardiac problems.  (*Id.*)  Plaintiff saw ARNP Kanive a few days later on July 9,

10  2011 and agreed at that time to try a new drug, Venlafaxine, for his hip pain pending a

11  determination by the CRC about a referral for an orthopedic evaluation.  (*Id.*)

12         On August 3, 2011, plaintiff's case was presented again to the CRC for orthopedic

13  evaluation and possible right hip replacement.  (*Id.*)  The CRC at that time approved plaintiff's

14  case as a Level I medically necessary intervention and proposed a referral to an orthopedic

15  surgeon for a hip replacement evaluation.  (*Id.*)

16         Shortly thereafter, on August 15, 2011, plaintiff had a consult with Dr. Kenneth Lin, an

17  orthopedic surgeon.  (*Id.*)  Dr. Lin noted that plaintiff had degenerative arthritis of the right hip

18  and he recommended a "possible steroid injection into the right hip thinking it could afford him

19  some temporary comfort for a few months."  (*Id.*)  After discussing Dr. Lin's recommendation

20  with ARNP Kanive, plaintiff indicated that he would prefer hip replacement over the steroid

21  injections.  (*Id.*)  ARNP Kanive noted that she would plan a phone consult with Dr. Lin.  (*Id.*)

22         On September 3, 2011, plaintiff suffered a fall down stairs at MCC.  Plaintiff was seen by

23  the MCC medical staff and it was noted that plaintiff had suffered some swelling over the front

REPORT AND RECOMMENDATION - 6

1   of his eighth and ninth ribs.  (Dkt. No. 39, Ex. 1 at 8.)  Plaintiff was prescribed Oxycodone to

2   treat the pain and was advised to continue ice and rest.  (*Id*.)

3          Plaintiff was seen by ARNP Kanive on September 19, 2011.  (*Id*.)  Plaintiff reported that

4   the pain in his hip had become unrelenting but that it was also very much helped by the use of

5   the Venlafaxine.  (*Id*.)  ARNP Kanive noted that she would consult to schedule plaintiff's hip

6   surgery.  From late-September to mid-December 2011, MCC medical staff prepared plaintiff for

7   his upcoming surgery.  (*Id*.)  ARNP Kanive monitored plaintiff's blood pressure and platelet

8   levels, and reduced his medication, all of which were necessary steps to ensure the success of,

9   and the ability to carry out, his surgery.  (*Id*.)  Plaintiff underwent hip replacement surgery on

10  December 13, 2011, which was followed by physical therapy rehabilitation.  (*Id*.)

11         Plaintiff signed his original complaint in this action on December 4, 2011, prior to his

12  surgery, though the pleading was not received by the Court for filing until December 15, 2011.

13  (*See* Dkt. No. 1.)  Plaintiff's original complaint was served on defendants in February 2012, and

14  defendants filed a timely answer to the complaint on April 3, 2012.  (*See* Dkt. Nos. 8-15, 18, and

15  22.)  On April 5, 2012, this Court issued a pretrial scheduling order in which a discovery

16  deadline of July 3, 2012 was set.  (Dkt. No. 24.)

17         On June 20, 2012, the parties filed a stipulated motion to amend the complaint and, on

18  July 30, 2012, defendants moved for issuance of a new pretrial scheduling order because

19  plaintiff's amended complaint had not yet been accepted for filing.  (Dkt. Nos. 27 and 28.)  On

20  September 14, 2012, this Court issued an Order granting the parties' stipulated motion to amend

21  and defendants' motion for issuance of a new pretrial scheduling order.  (Dkt. No. 29.)  On the

22  same date, the Court issued an Amended Pretrial Scheduling Order which established a new

23  discovery deadline of December 14, 2012.  (Dkt. No. 30.)

REPORT AND RECOMMENDATION - 7

On November 19, 2012, plaintiff filed a motion seeking to extend the discovery deadline again. (Dkt. No. 33.)  On January 22, 2013, the Court granted plaintiff's motion for an extension time and extended the discovery deadline to April 22, 2013. (Dkt. No. 41.)  At the same time, the Court re-noted defendants' recently filed motion for summary judgment to May 31, 2013. (*See id*.)  On April 23, 2013, the Court received from plaintiff a motion for voluntary dismissal and defendants thereafter filed a response in opposition to plaintiff's motion. (Dkts. No. 42 and 43.)  Plaintiff has been advised of the requirements of Rule 56 (*see* Dkt. No. 40) but has filed no response to defendants' motion for summary judgment.  Defendants' motion for summary judgment and plaintiff's motion for voluntary dismissal are now ripe for review.

DISCUSSION

Motion for Voluntary Dismissal

Plaintiff, in lieu of filing a response to defendants' summary judgment motion, filed a motion for voluntary dismissal of this action without prejudice pursuant to Fed. R. Civ. P. 41(a)(2). (Dkt. No. 42.)  Plaintiff asserts in his motion that voluntary dismissal without prejudice is warranted because of the "unique circumstances of this case" and the limitations inherent in attempting to litigate an action while incarcerated. (Dkt. No. 42.)  Plaintiff indicates that he is scheduled to be released from custody in April 2014 and he intends to retain legal counsel and orthopedic surgeons upon his release from custody so that this matter can be properly litigated. (Dkt. No. 42.)

Defendants oppose plaintiff's motion to dismiss and request that the Court proceed to disposition of their pending summary judgment motion. (Dkt. No. 43.)  Defendants request, in the alternative, that plaintiff's motion for voluntary dismissal be granted, and that the dismissal be with prejudice.  (*Id*.)

REPORT AND RECOMMENDATION - 8

Rule 41(a)(2) of the Federal Rules of Civil Procedure allows a plaintiff to dismiss an action without prejudice at any time pursuant to an order of the court, and subject to any conditions the court deems proper.  When ruling on a motion to dismiss without prejudice, the court must determine whether the defendant will suffer some plain legal prejudice as a result of the dismissal.  *Hyde & Drath v. Baker*, 24 F.3d 1162, 1169 (9th Cir. 1994); *Hamilton v Firestone Tire & Rubber Co.*, 679 F.2d 143, 145 (9th Cir. 1982).  Courts have identified the following factors to be considered in deciding a motion brought under Rule 41(a)(2):  (1) the defendant's effort and expense involved in preparing for trial; (2) excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action; (3) insufficient explanation of the need to take a dismissal; and, (4) the fact that summary judgment has been filed by the defendant.  *See United States v. Berg*, 190 F.R.D. 539, 543 (E.D. Cal. 1999); *see also Paulucci v. City of Duluth*, 826 F.2d 780, 783 (8th Cir. 1987); G*rover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir. 1994); *United States v. Outboard Marine Corp.*, 789 F.2d 497, 502 (7th Cir. 1986).

Under the circumstances of this case, these factors, in total, weigh in favor of defendants. Defendants note in their opposition to plaintiff's motion for voluntary dismissal that they have produced 500 pages in discovery and have engaged in "weighty motion practice."  While the Court does not necessarily endorse defendants' description of the motion practice in this case, defendants have, in fact, diligently responded to a number of motions filed by plaintiff, they have produced a significant amount of discovery, and they have themselves filed a motion for summary judgment.

Plaintiff has not been so diligent in moving this action forward.  This Court has extended the discovery deadline twice in this matter, the first time to accommodate plaintiff's desire to amend his complaint and the second time to permit plaintiff to conduct a final round of discovery

REPORT AND RECOMMENDATION - 9

before having to respond to defendants' summary judgment motion.  Despite the Court granting plaintiff an additional 90 days to conduct discovery in January 2013, plaintiff propounded no additional discovery during that period and, in fact, took no action other than to file the instant motion for voluntary dismissal after discovery had closed.

In addition to his failure to diligently prosecute this action, plaintiff also fails to offer a sufficient explanation of his need to take a dismissal.  While plaintiff suggests in his motion for voluntary dismissal that the circumstances of his case are unique, his case is actually a relatively straightforward one which presents no complicating factors other than that plaintiff is incarcerated, a fact of which he was certainly aware at the time he elected to file this action.

For the reasons set forth above, this Court is not persuaded that dismissal of this matter without prejudice under Fed. R.  Civ. P. 41(a)(2) is appropriate and therefore recommends that plaintiff's motion for voluntary dismissal be denied.

<u>Motion for Summary Judgment</u>

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).  Genuine disputes are those for which the evidence is such that a "reasonable jury could

REPORT AND RECOMMENDATION - 10

1    return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257.  Material facts are those

2    which might affect the outcome of the suit under governing law.  *Id*.

3        In response to a properly supported summary judgment motion, the nonmoving party

4    may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts

5    demonstrating a genuine issue of fact for trial and produce evidence sufficient to establish the

6    existence of the elements essential to his case.  *See* Fed. R. Civ. P. 56(e).  A mere scintilla of

7    evidence is insufficient to create a factual dispute.  *See Anderson*, 477 U.S. at 252.  In ruling on a

8    motion for summary judgment, the court is required to draw all inferences in a light most

9    favorable to the nonmoving party.  *Id*. at 248.  The court may not weigh the evidence or make

10   credibility determinations.  *Anderson*, 477 U.S. at 248.

11                                                    Eighth Amendment

12       Plaintiff alleges in his amended complaint that his Eighth Amendment rights were

13   violated when defendants, having knowledge of his serious medical condition, delayed surgery to

14   repair his damaged right hip leaving him in chronic pain for several years.

15       The Eighth Amendment imposes a duty upon prison officials to provide humane

16   conditions of confinement.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  This duty includes

17   ensuring that inmates receive adequate medical care.  *Id*.  In order to establish an Eighth

18   Amendment violation, a prisoner must satisfy a two-part test containing both an objective and a

19   subjective component.  The Eighth Amendment standard requires proof that (1) the alleged

20   wrongdoing was objectively "harmful enough" to establish a constitutional violation; and (2) the

21   prison official acted with a sufficiently culpable state of mind.  *Id*.

22       The objective component of an Eighth Amendment claim is "contextual and responsive

23   to 'contemporary standards of decency.'"  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting

REPORT AND RECOMMENDATION - 11

1    *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  The state of mind requirement under the subjective

2    component of the Eighth Amendment standard has been defined as "deliberate indifference" to

3    an inmate's health or safety.  *Farmer*, 511 U.S. at 834.  Under the "deliberate indifference"

4    standard, a prison official cannot be found liable for denying an inmate humane conditions of

5    confinement unless the official knows of and disregards an excessive risk to inmate health or

6    safety.  *Id*. at 837.

7         It is well established that differing opinions on medical treatment do not amount to a

8    violation under the Eighth Amendment.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)

9    (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)).  In order to prevail on an Eighth

10   Amendment claim in these circumstances, a plaintiff must show "that the course of treatment the

11   doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose

12   this course in conscious disregard of an excessive risk to plaintiff's health."  *Jackson*, 90 F.3d at

13   332 (citations omitted).

14        Defendants argue in their motion for summary judgment that plaintiff's Eighth

15   Amendment claim fails because the undisputed expert medical testimony shows that defendants

16   appropriately treated plaintiff's medical condition.  As noted above, defendants have submitted

17   in support of their summary judgment motion the declaration of defendant Kenneth Lauren,

18   M.D., which details the medical treatment provided plaintiff for his ailing right hip between

19   October 2006 and December 2011.  (Dkt. No. 39, Ex. 1.)

20        Dr. Lauren maintains in his declaration that defendants did not unnecessarily delay hip

21   replacement surgery for plaintiff but, rather, employed medically appropriate conservative

22   treatment for his gradually deteriorating hip condition until the joint was ripe for replacement.

23   (*See id*., Ex. 1 at 2.)  Dr. Lauren states that joint replacement surgery should only be done when

REPORT AND RECOMMENDATION - 12

1  "the joint is end-stage and 'ripe' for surgery and conservative measures have failed."  (Dkt. No.

2  39, Ex. 1 at 2.)  He explains that premature hip replacement, particularly for someone of

3  plaintiff's age, can be detrimental in the long run because it can put the individual in the position

4  of having the artificial hip joint expire thereby necessitating a second hip replacement at a later

5  date.  (*Id*., Ex. 1 at 2-3.)

6  Dr. Lauren notes that defendants and other MCC medical personnel appropriately

7  monitored the changes in plaintiff's hip joint through the use of x-rays and properly considered

8  and recommended conservative treatments including over-the-counter pain medications,

9  Oxycodone, steroids, topical pain relief creams, customized orthotic shoe inserts, physical

10  therapy, and use of a cane.  (*Id*., Ex. 1 at 2.)  Dr. Lauren states that when plaintiff's June 2011 x-

11  ray revealed possible avascular necrosis (AVN), his case was then properly presented to the

12  CRC, and approval for surgery was granted, because AVN can cause rapid progression of

13  osteoarthritis.[2]  (Dkt. No. 39, Ex. 1 at 3.)  According to Dr. Lauren, a hip replacement was not

14  medically necessary prior to the evidence of possible AVN.  (*Id*.)

15  Plaintiff makes no showing that the course of treatment defendants chose was medically

16  unacceptable under the circumstances and, in fact, the evidence in the record suggests the

17  contrary.  Once conservative treatment options were exhausted, and the joint was deemed ripe

18  for replacement, the joint was replaced.  That plaintiff disagrees with the chosen course of

19  treatment, does not establish a constitutional violation.  There is simply no evidence in the record

20  that the alleged delay in authorizing joint replacement surgery for plaintiff reflects a conscious

---

[2]  Dr. Lauren notes that even after plaintiff's x-rays revealed possible AVN in June 2011, an outside consulting orthopedic surgeon, Dr. Lin, still recommended a conservative course of treatment with a steroid injection into the hip in August 2011.  (Dtk .No. 39, Ex. 1 at 7.)  Nonetheless, a complete hip replacement was approved and performed.  (*Id*., Ex. 1 at 7-8.)

REPORT AND RECOMMENDATION - 13

1  disregard of an excessive risk to plaintiff's health.  Plaintiff has not established that defendants

2  were deliberately indifferent to his serious medical needs and, thus, defendants are entitled to

3  summary judgment on plaintiff's Eighth Amendment claim.

4                                              CONCLUSION

5          Based upon the foregoing, this Court recommends that plaintiff's motion for voluntary

6  dismissal be denied, that defendants' motion for summary judgment be granted, and that

7  plaintiff's amended complaint and this action be dismissed with prejudice.  A proposed order

8  accompanies this Report and Recommendation.

9          DATED this 17th day of July, 2013.

10

11                                                    _____
                                                       JAMES P. DONOHUE
12                                                     United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION - 14